



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 9, 2026**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### SAN ANGELO DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| William Glenn Johns, | § | Case No. 21-60010-bwo7 |
| | § | Chapter 7 |
| Debtor. | § | |

| | | |
|---|---|---|
| David Rutan and Michelle Rutan, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adversary No. 22-06000 |
| | § | |
| William Glenn Johns, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

Over two days in June and July,[1] the Court conducted a new trial in this matter

relating to the sale of two mobile home parks that occurred on December 27, 2023.

_____

[1] The new trial took place on June 17, 2025, and July 8, 2025.

The mobile home parks were owned by the Carswell Cherokee Trust, one of two trusts held by the Debtor's, William Glenn Johns ("Johns"), IRA. Previously, the Court denied Plaintiffs', David and Michelle Rutan (the "Rutans"), objection to Johns's discharge finding that the Rutans did not meet their burden to prove Johns was not entitled to a discharge under 11 U.S.C. § 727. Dkt. No. 74.[2] However, on March 24, 2025, the Court granted a new trial on the Rutans' objection to Johns's discharge pursuant to 11 U.S.C. § 727(a)(3) and (a)(4). Dkt. No. 107. The Court reopened the record and received evidence relating to the sale of two mobile home parks. During the new trial, the Court admitted hundreds of pages of documents and the testimony of one witness, Johns.

As stated in the Court's Order granting a new trial, the sale of the mobile home parks appeared to be of such a magnitude that Johns's prior testimony and representations from the Original Trial (defined herein) were called into question. *See* Dkt. No. 107 at 3. The Rutans alleged that the sale resulted in proceeds that were more than 10 times the value Johns placed on the mobile home parks in his Schedule (defined herein) filed in his bankruptcy case. *See* Dkt. No. 79 at ¶9; Case No. 21-60010, Dkt. No. 295. Nonetheless, the evidence admitted at trial did not paint the same picture the Rutans alleged it would. Instead, Johns credibly testified that the Schedule contained a proper disclosure of the value of the two mobile home parks. Further, the Rutans did not introduce evidence that Johns knowingly and fraudulently made a false oath or account. The Rutans also failed to introduce

---

[2] "Dkt. No." refers to the numbered docket entry in the Court's electronic case file for Case No. 22-06000, unless otherwise stated.

evidence that Johns concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information regarding his financial condition. Because the Rutans did not meet their burden to show Johns is not entitled to a discharge under § 727(a)(3) or (a)(4), the Court denies their objections and grants Johns his discharge.

The Court sets forth its ruling above more fully herein. The Court's findings and conclusions are based upon the record before the Court, both the Original Trial and the new trial. The Court issues its findings and conclusions pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be deemed so, and vice versa.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and the Northern District of Texas's *Order of Reference of Bankruptcy Cases and Proceedings* Nunc Pro Tunc. Misc. Order No. 33 (N.D. Tex. Aug. 3, 1984). This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(J). Venue of this adversary proceeding is proper in this District and Division pursuant to 28 U.S.C. § 1409.

## Procedural History

The Court held an original trial on the Rutans' objection to Johns's discharge on November 30, 2023, December 1, 2023, and December 5, 2023 (the "Original Trial"). On September 26, 2024, the Court entered its Findings of Fact and

Conclusions of Law regarding the Original Trial. Dkt. No. 74. The same day, the Court entered its Order denying the Rutans' objection to Johns's discharge. Dkt. No. 75.

On October 10, 2024, the Rutans moved for a new trial ("Motion for New Trial"). Dkt. No. 79. On March 24, 2025, the Court granted a new trial related to the sale of two mobile home parks by the Carswell Cherokee Trust on December 27, 2023. Dkt. No. 107. The Court granted a partial new trial and reopened the record to (1) take evidence on the mobile home park sales and (2) determine whether Johns's discharge should be denied under § 727(a)(3) or (a)(4). *Id.* at 4 § III.

On June 17, 2025, and July 8, 2025, the Court conducted the new trial. This Memorandum Opinion sets forth the Court's ruling.

## **Burden of Proof**

Because the Bankruptcy Code provides the court ***shall*** grant a debtor a discharge unless a statutory exception applies, "exceptions [to discharge] are construed strictly against the creditor and liberally in favor of the debtor." *Cadle Co. v. Duncan* (*In re Duncan*), 562 F.3d 688, 695 (5th Cir. 2009) (citing *Hudson v. Raggio & Raggio, Inc.* (*In re Hudson*), 107 F.3d 355, 356 (5th Cir. 1997)). Therefore, the party objecting to a debtor's discharge under § 727 bears the burden to prove by a preponderance of the evidence that the debtor is not entitled to a discharge because one or more of the enumerated exceptions applies. *See Duncan*, 562 F.3d at 695.

Here, it was the Rutans' burden to prove by a preponderance of the evidence that Johns is not entitled to a discharge pursuant to either § 727(a)(3) or (a)(4). In

their case in chief, the Rutans did not call any witnesses.[3] Instead, the Rutans introduced and relied on hundreds of pages of documents to prove Johns was not entitled to a discharge. The Rutans argued these documents, together with documents admitted during the Original Trial,[4] evidenced Johns's violation of both § 727(a)(3) and (4). Upon review of the evidence in both the Original Trial and the new trial, the Court concludes the Rutans failed to meet their burden of proof.

## **Findings of Fact**

This bankruptcy case has a long history. In 2023, the Court held a 6-day trial ("Exemption Trial") on the Chapter 7 Trustee's and Rutans' objection to Johns's claimed IRA exemption, and the Court held a 3-day trial (previously defined as the "Original Trial") on the Rutans' objection to Johns's discharge. The Court incorporates by reference its prior findings of fact in the Exemption Trial (Case No. 21-60010, Dkt. No. 389) and the Original Trial (Dkt. No. 74). Any specific findings of fact from the Exemption Trial and Original Trial necessary for the Court's ruling in the new trial are set forth herein and cited to the appropriate prior ruling.

Johns commenced this bankruptcy case on February 3, 2021. Case No. 21-60010, Dkt. No. 1. By occupation, Johns is a real estate investor and property manager. Dkt. No. 74 at 5 ¶ 14. Despite his occupation, Johns does not individually own any real estate. Likewise, Johns does not appear to own much in the way of

---

[3] During Johns's case in chief, the Rutans' counsel cross-examined Johns, the only witness called during the new trial.

[4] On April 9, 2025, the Honorable Robert L. Jones retired as the bankruptcy judge overseeing Johns's bankruptcy case and this adversary proceeding. On April 10, 2025, the Honorable Brad W. Odell was appointed as the successor to Judge Jones. The Court studied the record in the Original Trial as part of its ruling on the new trial.

assets. According to his bankruptcy schedules, Johns's only major asset is his self-directed IRA. Johns asserts the approximate value of his self-directed IRA is $250,000. *Id.* at 2 ¶ 3.

Johns established his IRA on December 27, 2016. The IRA is administered by Nuview IRA, Inc. Johns made three monetary contributions totaling $19,000 to his IRA in the following amounts and years: $6,500 in 2016; $6,500 in 2017; and $6,000 in 2018. Case No. 21-60010, Dkt. No. 389 at 3 § II. The IRA is self-directed, meaning Johns directs and takes responsibility for any investments he chooses for the IRA. *Id.*

Johns's IRA made two investments. The first investment of $13,000 was made in a land trust named Carswell Cherokee Trust. *Id.* The second investment of $5,900 was made in another land trust named Southeast Financial Trust. *Id.* Johns's IRA holds a 49% beneficial interest in the Carswell Cherokee Trust and a 100% interest in the Southeast Financial Trust. *Id.* at 5; Case No. 21-60010, Dkt. No. 295 at 1 § I.1. Relevant to the new trial are transactions made by the Carswell Cherokee Trust.

The trustee of the Carswell Cherokee Trust (the "Trust") is Brian Anderson. Dkt. No. 74 at 6 ¶ 18. Johns has never been the trustee of the Trust. Johns does not control the financial records of the Trust. The beneficiaries of the Trust are Johns's IRA, Terrell Sheen's IRA, and Cathy Sheen's IRA. *Id.* Terrell Sheen ("Sheen") is a business partner of Johns. At the new trial, Johns testified that Sheen or his IRA provided most of the capital for investments made by the Trust.

The Trust owns and manages real estate and mobile homes. Case No. 21-60010, Dkt. No. 389 at 4. In January 2017, through a series of asset purchase

agreements, the Trust acquired various mobile homes, rent-to-own contracts for mobile homes, business equipment used in managing mobile home park(s), and real property located in Ware County, Georgia from Denny L. Taylor and Taylor Repo, Inc. Rutans Exs. 23, 24.

As part of the first asset purchase agreement, the Trust acquired all promissory notes receivable held by Taylor Repo, Inc. or Denny L. Taylor, and all assets owned or leased by Denny L. Taylor or Taylor Repo, Inc. used by Taylor Repo, Inc. in the normal course of its business. Rutans Ex. 23. The stated purchase price for these assets was $735,145.31. *Id.* at ¶ 4.

As part of the second asset purchase agreement, the Trust acquired various tracts of land located at 503 Cherokee Street, Waycross, GA and 1900 Carswell Avenue, Waycross, GA. Rutans Ex. 24. The purchase included all personal property, particularly mobile homes, located on the land and used in the operation of the mobile home parks. *Id.* The stated purchase price for these assets was $1,147,267.63. *Id.* The purchase price reflected the amount owed by Taylor Repo, Inc. to PrimeSouth Bank. The Trust assumed the debt owed to PrimeSouth Bank as payment of the purchase price. Rutans Exs. 24, 26.

The Court understands the Trust essentially purchased Taylor Repo, Inc.'s third-party mobile home financing business and two mobile home parks. The total purchase price for the assets was $1,882,412.94. *See* Rutans Exs. 23, 24. The parties did not allocate the purchase price to specific assets or mobile home parks.

As mentioned, to accomplish the purchase under the second asset purchase agreement, the Trust assumed the debt owed to PrimeSouth Bank. To pay the purchase price under the first asset purchase agreement, Sheen's IRA fronted more than $550,000 to the Trust. Case No. 21-60010, Dkt. No. 389 at 6. As will be discussed, the agreement between Sheen, Johns, and the Trust required repayment of funds loaned by Sheen or his IRA before Trust beneficiaries would receive distributions from the Trust. Johns Ex. 10.

In June 2017, the Trust entered into two asset purchase agreements with Michael H. Hobbs and Jill Hobbs (the "Hobbses") for the purchase of personal and real property. *See* Rutans Exs. 27, 28. These transactions were structured like the asset purchases from Taylor Repo, Inc. The first asset purchase agreement with the Hobbses addressed the purchase of various contracts for deed held by the Hobbses for the purchase of mobile homes by third parties. Rutans Ex. 27. The purchase price for these assets was $237,085.29. *Id.*

The second asset purchase agreement with the Hobbses addressed the purchase of various parcels of real property on which mobile home parks were operated. Rutans Ex. 28. One of these mobile home parks is called the Maple Hill Mobile Home Park. *Id.* The second asset purchase agreement also included all related personal property needed to operate the mobile home parks. *Id.* The total purchase price for these assets was $449,423.55. *Id.*

The total purchase price of the assets from the Hobbses was $686,508.84. Rutans Exs. 27, 28. Once again, the parties did not allocate the purchase price to specific assets or mobile home parks.

Like the Taylor Repo, Inc. purchase, the Hobbs purchase was accomplished by the Trust assuming debt and a loan from Sheen or his IRA in the amount of $242,881.53. *See* Case No. 21-60010, Dkt. No. 389 at 8–9, 36–37; Johns Ex. 9.

Relevant to the new trial from the assets listed above are what the Court calls rent-to-own contracts for mobile homes, mobile homes, and two mobile home parks. One mobile home park is the Maple Hill Mobile Home Park. The other mobile home park was referred to by the parties as the Carswell Mobile Home Park,[5] which is located at 1900 Carswell Avenue in Waycross, GA.

Since January 2017, the Trust owned and managed the Carswell Mobile Home Park. Since June 2017, the Trust owned and managed the Maple Hill Mobile Home Park. Likewise, the Trust owned and managed the rent-to-own contracts and mobile homes associated with each park until the Trust sold these assets in December 2023.

Also at the core of the new trial is Johns's assertion that the value of his IRA is approximately $250,000. The Court ordered Johns to file a schedule disclosing the assets in his IRA. *See* Adv. No. 22-6001, Dkt. No. 28 at 6. Johns complied with the Court's order and filed in the bankruptcy case his *Amended Schedule of Assets and*

---

[5] Johns and his counsel also referred to the Carswell Mobile Home Park as the Satilla Village Park; the Court will, however, refer to it as the Carswell Mobile Home Park.

*Liabilities of Debtor's NuView IRA; of Carswell Cherokee Trust; and of Southeast Financial Trust* (the "Schedule"). Case No. 21-60100, Dkt. No. 295.

The Schedule sets forth that the IRA holds a 49% interest in the Trust and a 100% interest in the Southeast Financial Trust. *Id.* To support the value of the IRA, Johns included information about the assets and liabilities of both the Trust and the Southeast Financial Trust as Exhibits A and B, respectively. *Id.*, Exs. A, B.

At the new trial, Johns testified that Exhibit A included the various real properties, rent-to-own contracts, and mobile homes owned by the Trust. Johns testified that he worked with Shanell Smith[6] to compile the list of assets for the Trust. He testified that the Schedule either included the estimated value of the rent-to-own contracts or the mobile homes, but not both. In other words, for the Carswell Mobile Home Park Johns included a list of the estimated value of the rent-to-own contracts, but not the estimated value of the mobile homes.

Johns further testified that he included in the Schedule the value of the real estate. Johns testified he considered the market value of the real estate as stated by the local taxing authorities in preparing the Schedule. Johns testified that neither he nor the Trust acquired an appraisal to determine these values.

In reviewing the Schedule, which was admitted into evidence as Exhibit 43 in the Original Trial, Johns values the total assets of the Trust at $4,848,518.72.[7] Most

---

[6] Shanell Smith also worked with Sheen, managing many of Sheen's properties. Case No. 21-60100, Dkt. No. 389 at 6–7.

[7] This amount includes the amounts on Exhibit A, the judgment against Caleb Walsh, and two bank accounts. Johns valued the judgment at $0.00. The values for the judgment and the two bank accounts were never at issue during the new trial.

of the value comprises rent-to-own contracts in the amount of $3,967,404.99. The real estate is valued at $815,613. On May 9, 2023, Johns declared under penalty of perjury that the Schedule was true and correct.  Therefore, the Court takes the values stated in the Schedule to be as of May 9, 2023.

Drilling down further in the Schedule, Johns values the assets related to the Carswell Mobile Home Park at $857,524.70, comprised of $708,274.70 in rent-to-own contracts and $149,250 in real estate. Rutans Ex. 43. Johns values the assets related to the Maple Hill Mobile Home Park at $108,495.18, comprised of $76,596.18 in rent-to-own contracts[8] and $31,899 in real estate. Rutans Ex. 43.

The Carswell Mobile Home Park consists of 48 total lots; whereas, the Maple Hill Mobile Home Park consists of 18 total lots. Johns testified that at the time the Schedule was created, neither mobile home park was at full capacity.

Each mobile home park consists of two different types of tenants. The first is the tenant that already owns his or her mobile home and just leases the lot in the mobile home park from the Trust. The second is the tenant who leases the lot in the mobile home park and also rents the mobile home from the Trust under a rent-to-own contract. Johns testified that most of the tenants in the Carswell Mobile Home Park were tenants under rent-to-own contracts; whereas, most of the tenants in the Maple Hill Mobile Home Park were tenants with their own mobile home.

Johns further testified that the value of rent-to-own contracts for each park in the Schedule may not be completely accurate. Johns stated that rent-to-own contracts

---

[8] Johns testified during the new trial that the Schedule contains an error in that the rent-to-own contracts were listed on the same line as the real estate value for the Maple Hill Mobile Home Park.

included in the $2,766,875.49 figure on the Schedule could include contracts that related to the Carswell Mobile Home Park and/or the Maple Hill Mobile Home Park; though Johns could not testify with any certainty on this point. Further, Johns's testimony was not clear as to whether a discount was reflected in the value given to the rent-to-own contracts in the Schedule. At one point Johns testified that in valuing rent-to-own contracts in the mobile home financing industry, he would discount the face value of the contract by 50%.

In October 2023, Johns was contacted by Tyler Ware regarding the potential opportunity to purchase existing mobile home parks from Johns and Sheen. Johns testified that he had not previously known Mr. Ware. Mr. Ware received Johns's contact information from another party in the mobile home park business. Johns, working with Sheen, presented Mr. Ware with several possible mobile home parks Sheen might consider selling to Mr. Ware. Ultimately, Mr. Ware decided to purchase from the Trust the Carswell Mobile Home Park and the Maple Hill Mobile Home Park.

Johns stated that his involvement with the sale of these two parks was as the middleman between Mr. Ware and Sheen. Johns's understanding about the purchase price for the two mobile home parks was that Mr. Ware wanted to minimize cash needed for closing and Sheen wanted to make a good return on the investment. Ultimately, Johns understands the parties came to agree on a purchase price of $2,382,500 for the Carswell Mobile Home Park and the Maple Hill Mobile Home Park.

To pay the purchase price, Mr. Ware (really through his entity, Think Bigger Properties, LLC) acquired a first lien mortgage loan from Douglas National Bank in the amount of $1,391,434.50 and a second lien mortgage loan from the Trust in the amount of $1,082,500. Structuring the transaction in this way allowed Mr. Ware to minimize the amount of cash he had to bring to closing and allowed the Trust to receive interest on its loan to Mr. Ware.

Johns testified that he prepared a handwritten sheet for the terms of the seller financed second lien note. The handwritten term sheet was included in Rutans Exhibit 220. Other than Johns acting as the middleman and preparing the handwritten term sheet, Johns did not have any other involvement in the sales transaction. Johns did not prepare any closing documents, the contract to purchase the parks, any bills of sale, or other documents relating to the sale. Johns testified that the first time he even saw the signed contract was during the first day of the new trial.

Johns testified that as part of the sale the Trust had to fill all 48 lots of the Carswell Mobile Home Park with mobile homes. These homes did not have to be rented, but the homes did have to be rent ready. Johns testified that, to meet this requirement, the Trust moved mobile homes from the Cherokee Mobile Home Park to the Carswell Mobile Home Park. Johns further testified that both parks needed certain repairs to the existing structures to get them rent ready, although Johns could not testify to the specifics on how many properties needed repair or cost of repairs.

13

During Johns's testimony, neither side questioned Johns about the real substance of the sales transaction. While total lots for each park were discussed, Johns never testified as to how many lots were rented in either park at the time of sale, how many rent-to-own contracts were being transferred at the time of sale, and how many mobile homes were being transferred at the time of sale. As such, the Court examined the documents admitted into evidence to see what it could glean from them.

From these documents, the Court finds helpful Rutans Exhibit 220, admitted into evidence, which contains the deposition on written questions to Douglas National Bank and the documents produced by Douglas National Bank. According to the loan file of Douglas National Bank, the Trust sold Mr. Ware 43 mobile homes. It does not clearly indicate at which mobile home park these 43 homes are located. It appears that 22 rent-to-own contracts associated with the Carswell Mobile Home Park were transferred to Mr. Ware. The Douglas National Bank documents do not provide the Court with this information for the Maple Hill Mobile Home Park.

With an understanding of the assets transferred as part of the sale, the Court also considers the liabilities owed by the Trust. The Schedule provides that total liabilities owed by the Trust were $2,670,795.83, of which $1,940,290.67 is owed to Sheen's IRA and $730,505.16 is owed to other parties. Throughout the course of the new trial, Johns testified that the Trust could not have accomplished the purchases from Denny Taylor and Taylor Repo, Inc., or the Hobbses without the additional capital from Sheen and Sheen's IRA. This accounts for the $1,940,290.67 on the Schedule owed to Sheen's IRA.

Johns introduced into evidence a summary of the contributions made by Sheen, which Johns testified were owed at the time of the sale. The amount of capital contributions on this summary totaled $3,091,253.24. Johns Ex. 9. The summary included the same $1,940,290.67 as the Schedule. It, however, includes an additional $1,150,962.57 in capital from Sheen or Sheen's IRA which is not on the Schedule. *Id.* Johns testified that Sheen contributed these amounts to keep the Trust and the properties it owns operating.

Similar to the Original Trial, Johns also introduced into evidence a one-page agreement dated December 30, 2016, signed by the original trustee of the Trust. Johns Ex. 10. This agreement provides that all monies owed, including contributions and loans, are to be paid or reimbursed before any Trust profits are distributed to the Trust beneficiaries. *Id.*

While testimony seemed to indicate that some of these liabilities could be allocated to the purchases and maintenance of the Carswell Mobile Home Park and the Maple Hill Mobile Home Park, the agreement requires all contributions or loans to be paid before distribution to beneficiaries. Thus, allocating the contributions or loans to the various properties is not necessary.

### Asserted Grounds for Denial of Discharge in New Trial

As argued by the Rutans in the Motion for New Trial, the Rutans assert that Johns's discharge should be denied because (1) Johns concealed the sale of the two mobile home parks and their true value, and (2) Johns knowingly and fraudulently made a false oath by under valuing his IRA, as reflected on the Schedule and his

bankruptcy schedules, because the two mobile home parks sold for a significant multiple of the values given.

## Conclusions of Law

The Bankruptcy Code gives the honest but unfortunate debtor a fresh start. *See Judgment Factors, L.L.C. v. Packer* (*In re Packer*), 816 F.3d 87, 91 (5th Cir. 2016); *Ichinose v. Homer Nat'l Bank* (*In re Ichinose*), 946 F.2d 1169, 1172 (5th Cir. 1991); 11 U.S.C. § 727(a). In fact, the Court ***shall*** grant the debtor a discharge unless one of the statutory grounds for denial of a discharge is met. 11 U.S.C. § 727(a) (emphasis added). "The exceptions are construed strictly against the creditor and liberally in favor of the debtor." *Duncan*, 562 F.3d at 695; *see Packer*, 816 F.3d at 91. Denying the discharge is an extreme remedy which should not be taken lightly. *See Pher Partners v. Womble* (*In re Womble*), 289 B.R. 836, 845 (Bankr. N.D. Tex. 2003) (Jones, J., ret.) (citing *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993)). Only when a debtor commits specific and serious infractions may a court deny the debtor a discharge. *Ichinose*, 946 F.2d at 1172.

The Court reopened the record in this adversary proceeding to determine whether failure to disclose the sale of the Carswell Mobile Home Park and the Maple Hill Mobile Home Park rose to the level of specific and serious infractions by Johns to deny him his discharge under § 727(a)(3). Likewise, the Court considered whether the purchase price for the mobile home parks sold by the Trust established that the value Johns gave to his IRA on his bankruptcy schedules and the Schedule

16

constitutes a false oath or account under § 727(a)(4)(A). The Court will address each in turn.

### A. Denial of Discharge under § 727(a)(3)

Section 727(a)(3) provides that a debtor is not entitled to a discharge if

the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3). The party objecting to a debtor's discharge bears the burden to prove that (1) the debtor failed to keep or preserve financial records, and (2) the creditor is unable to determine the debtor's financial condition because the debtor failed to keep and maintain records. *Buescher v. First United Bank & Tr.* (*In re Buescher*), 783 F.3d 302, 307 (5th Cir. 2015). If the creditor meets its burden, then the burden shifts to the debtor to prove "the failure to keep records was justified under the circumstances." *Id.* at 308

The record keeping obligations of 11 U.S.C. § 727(a)(3) pertain to the debtor and not any separate legal entity owned by the debtor. *Packer*, 816 F.3d at 94.

Throughout the new trial, the Rutans argued that Johns concealed the sale of the two mobile home parks, the sales contract, and the handwritten term sheet from the Chapter 7 Trustee and the Rutans. Further, the Rutans argued that Johns was required to disclose the sale and turn over all documents related to the sale to the Chapter 7 Trustee at the time of the sale.

It is true that the Bankruptcy Code imposes a duty on debtors to turn over all property belonging to the bankruptcy estate, and documents, books, records, and

17

information relating to property of the bankruptcy estate to the trustee. *See* 11 U.S.C. § 521(a)(4); *Buescher*, 783 F.3d at 308. Likewise, the debtor must cooperate with the trustee during the bankruptcy case. *See* 11 U.S.C. § 521(a)(3); *Buescher*, 783 F.3d at 308.

While Johns was required to turn over records to and cooperate with the Chapter 7 Trustee, the Rutans failed to establish that Johns did not satisfy his obligations under the Bankruptcy Code. First, the sale in question concerned property owned by the Trust and not Johns's bankruptcy estate. Johns is not required to turn over financial records of the Trust because it is a separate legal entity. *See Packer*, 816 F.3d at 94. This Court's prior order requiring Johns to disclose the assets of the IRA and Trust, in this Court's opinion, did not expand Johns's duty beyond that required by the Bankruptcy Code; i.e., Johns was not required to turn over records owned and controlled by the Trust, but he was required to disclose his interest in the IRA and the IRA's interest in the Trust. As discussed more fully herein, the Court finds that Johns properly disclosed his IRA and the Trust assets in his Schedule. This satisfied Johns's duties under this Court's order and 11 U.S.C. § 521(a)(4).

Johns credibly testified that he was the middleman in the sales transaction. Though he drafted the handwritten term sheet, Johns turned the term sheet over to Sheen and Mr. Ware. Johns did not maintain a copy of the term sheet in his personal records. Johns testified he did not prepare any other documents related to the sale. The sale was closed by an attorney in Georgia. He did not attend the sale closing or sign any of the closing documents. Johns testified he had not seen the sales contract

18

until the first day of the new trial. All documents, including the handwritten term sheet, were records of the Trust and other parties involved in the sale. The evidence establishes that, other than the handwritten term sheet, Johns was not involved in and did not control the sale documents or records.

Further, Johns testified during the new trial that the Chapter 7 Trustee never requested from Johns the sales contract, the handwritten term sheet, or any other documents related to the sale. Johns testified that he believed he had turned over all documents requested by the Chapter 7 Trustee. Johns's testimony on this point was never controverted by the Rutans. The Rutans did not present any evidence that requests from the Chapter 7 Trustee went unanswered. The Rutans, likewise, did not call the Chapter 7 Trustee to testify that Johns failed to cooperate with him. The lack of contradicting evidence to Johns's testimony establishes that Johns satisfied his obligation to cooperate with the Chapter 7 Trustee.

Moreover, the Rutans did not put on evidence that any alleged failure to disclose the sales transaction, turn over sales documents, or turn over the handwritten term sheet prevented the Rutans from ascertaining Johns's financial condition. Neither David nor Michelle Rutan testified at the new trial that they were unable to ascertain Johns's financial condition because Johns failed to disclose or concealed the sales transaction.[9] The Chapter 7 Trustee also did not testify at the new trial that he could not ascertain Johns's financial condition because of the alleged concealment of the sales transaction.

---

[9] The Rutans likewise did not testify in the Original Trial. *See* Dkt. No. 74 at 22 ¶43.

For these reasons, the Court finds that the Rutans failed to meet their burden.

The Court denies the Rutans' request to deny Johns's discharge under § 727(a)(3).

### B. *Denial of Discharge under § 727(a)(4)(A)*[10]

Section 727(a)(4)(A) provides that a debtor is not entitled to a discharge if the debtor knowingly and fraudulently makes a false oath or account in connection with the case. 11 U.S.C. § 727(a)(4)(A). The Fifth Circuit has explained

> to prevail on a claim under this subsection, an objecting plaintiff must prove by a preponderance of the evidence that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case.

*Packer*, 816 F.3d at 94 (citation modified).

To prove fraudulent intent, the objecting party may prove either actual intent to deceive or a reckless indifference to the truth. *Id.* at 95 (citing *Sholdra v. Chilmark Fin. LLP* (*In re Sholdra*), 249 F.3d 380, 382 (5th Cir. 2001)). "Circumstantial evidence may be used to prove fraudulent intent, . . . and the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient" to find fraudulent intent. *Duncan*, 562 F.3d at 695 (citing *Sholdra*, 249 F.3d at 382–83).

False statements contained in the debtor's schedules may be sufficient to justify denying the discharge under § 727(a)(4)(A). *Duncan*, 562 F.3d at 695. Later

---

[10] While the Court granted a new trial to determine whether Johns's discharge should be denied under either § 727(a)(3) or 727(a)(4), the parties' *Joint Pre-Trial Order Related to Reopened Trial* specifically provided that the contested legal issue was whether Johns made a false oath or account. Dkt. No. 130 at 2, 6–7. Subparagraph (A) of § 727(a)(4) addresses denial of a discharge based on a false oath or account. Thus, the Court considered only Subparagraph (A) in this new trial.

amendments to the schedules may not relieve a debtor from false statements contained in earlier versions of a debtor's schedules. *Sholdra*, 249 F.3d at 382. This is especially true when amendments are made only after the false statements are brought to the attention of the debtor. *Id.*

The Rutans continuously assert that Johns knowingly and fraudulently made a false oath concerning the value of his IRA based on an incorrect valuation of the assets in the Trust. In their Motion for a New Trial, the Rutans asserted that Johns was involved in the sale of Trust assets for more than thirteen times the value Johns declared in his Schedule. Dkt. No. 79 at ¶ 9. During the new trial, the Rutans continued to argue that Johns knowingly and fraudulently made a false oath based on his disclosures in the Schedule.

Yet, like the Original Trial, the Rutans failed to provide evidence on all elements of their objection under § 727(a)(4)(A). *See* Dkt. No. 74 at 19 ¶ 34.

First, the Rutans did not provide any evidence that the values placed on the Carswell Mobile Home Park and the Maple Hill Mobile Home Park were false. The Rutans' argument that the two parks sold for more than thirteen times their scheduled value is based on Johns's value of the real estate. *See* Case No. 21-60010, Dkt. No. 295 at 5, Ex. A. Johns testified that the Schedule listed not only the value of the real estate based on the market value assessed by the local taxing authorities, but also the value of each park's rent-to-own contracts or mobile homes.

For the value of the Carswell Mobile Home Park, Johns valued the assets at $857,524.70, comprised of $708,274.70 in rent-to-own contracts and $149,250 in real

estate. Rutans Ex. 43. For the Maple Hill Mobile Home Park, Johns valued the assets at $108,495.18, comprised of $76,596.18 in rent-to-own contracts[11] and $31,899 in real estate. Rutans Ex. 43.

Johns testified that even these values might not include all the rent-to-own contracts, as some of those rent-to-own contracts could have been included in the $2,766,875.49 value assigned to all other rent-to-own contracts held by the Trust. Further, Johns testified that, as a condition of the sale to Mr. Ware, additional mobile homes had to be moved to the Carswell Mobile Home Park and repairs had to be made. While the Rutans' counsel cross-examined Johns on these issues, Johns never contradicted his earlier testimony, and the Rutans never introduced any evidence to refute this testimony.

In fact, Rutans' Exhibits 23, 24, 27, and 28 provide the purchase documents for when the Trust originally acquired both mobile home parks. These purchases, while they included additional parks, totaled $2,568,921.78 in assets acquired by the Trust. Therefore, the value assigned by Johns in the Schedule was in the range of both the purchase price and the sales price at issue.

Second, even if the values assigned to the Carswell Mobile Home Park and the Maple Hill Mobile Home Park were false, the Rutans did not provide any evidence that Johns knew the values were false. Johns credibly testified how he valued the mobile home parks. Johns testified that he used the value of the rent-to-own contracts and the market value assessed by the local taxing authorities to come up with the

---

[11] *See* supra n. 8.

values for the parks. The Rutans did not present any evidence that these values were wrong. The Rutans did not call any appraisers or valuation experts to dispute the values assigned by Johns. The Rutans likewise did not introduce any evidence showing Johns knew the values were wrong or recklessly used some methodology in valuing these assets in disregard for normal valuation methods.

Next, the Rutans did not prove, much less even address, the materiality of the alleged false oath on Johns's bankruptcy case.[12] The mobile home parks were owned by the Trust and not by Johns individually. Any benefit Johns might have received from the sale of the mobile home parks would have to follow the distribution provisions of the Trust. The Rutans did not provide any evidence that Johns or his bankruptcy estate was entitled to any of the sales proceeds.

Finally, the Rutans did not prove that Johns fraudulently made any false oaths. While the Rutans argued Johns amended his schedules multiple times and was ordered by this Court to disclose in more detail the assets of the IRA and the Trust, any amendments made continued to match Johns's original disclosure that the value of his IRA was $250,000. The Rutans failed to introduce any evidence to dispute this assertion.

During the new trial, Johns testified as to how he valued the assets owned by the Trust. Johns further testified as to the liabilities of the Trust and how payment of those liabilities was required prior to any distribution of profits to the Trust

---

[12] The Fifth Circuit has held that materiality of the false statement is not solely based on an omitted asset's value, but rather the statement's relationship to the debtor's business transactions or the discovery of assets. *Duncan*, 562 F.3d at 695.

beneficiaries. While Johns's Exhibit 10 appears minimal in substance, the Rutans did not introduce any evidence to contradict its terms or the requirement that contributions and loans made to the Trust had to be repaid before distributions. *See* Johns Ex. 10.

Ultimately, the Court finds that the Schedule does not constitute a false oath. The Court also finds that Johns has consistently maintained the value of his IRA is $250,000, and his amendments to his schedules and the Court's requirement to provide greater detail do not constitute a false oath.

For these reasons, the Court finds the Rutans failed to meet their burden. The Court denies the Rutans' request to deny Johns's discharge under § 727(a)(4)(A).

## <u>Conclusion</u>

Based on the evidence admitted at the Original Trial and the new trial, the Court finds that the Rutans have failed to satisfy their burden pursuant to both § 727(a)(3) and (a)(4). Johns did not violate § 727(a)(3) by failing to disclose or produce any records regarding the sale of the two mobile home parks. Further, Johns did not make a false oath related to the value of the two mobile home parks, the Schedule, or any other schedules or amendments filed in his bankruptcy case. Therefore, the Court denies the Rutans' objection to Johns's discharge under § 727(a) of the Bankruptcy Code.

###End of Memorandum Opinion###